Good morning. We have six cases before us today. Four of them are scheduled for oral argument and two of the cases are submitted on the briefs. We understand that with respect to the first three cases on the schedule 15, 30, 29, 15, 30, 51, 15, 30, 63, that counsel for the appellant, Counselor Tijerina, you requested to combine your argument so you're going to address all three cases with ten minutes and then you reserve five minutes for rebuttal. Is that correct? And then also the counsel for the government, you each are going to take five minutes to address each one of the cases. You're going to argue in the order that I have here before me, correct? Okay, well let's get started then. Mr. Counselor, Mr. Tijerina, you may proceed. Thank you, Your Honor. Good morning. Good morning. If it may please the court, my name is Lorenzo Tijerina. I am before the panel this morning representing Petitioner Juan Carlos Ayala, Juan Medina, and Juan Montelongo. Petitioners before the United States Court of Appeals. All three petitioners are before the court. Just a second, sir. We've got a little mix up here. Okay, you may proceed. Thank you, Your Honor. All three petitioners are before the court seeking review of the United States Merit Systems Protection Board's decision upholding their removal from federal service as career employees of the United States Department of Homeland Security. All three petitioners were law enforcement officers with the Immigration and Customs Enforcement. The only non-supervisor is Petitioner Ayala. Counselor, you can assume that we've read the briefs and we're familiar with the background and the facts of the case. Perhaps you can proceed to your legal arguments on the first case and then take it in order from there. Yes, sir. In Mr. Ayala's case, Your Honor, the legal arguments are that he in particular falls within the same ambit as Mr. Montelongo. You have a supervisor who is an LEO and you have his, you have a his abornment is also an LEO. The government has tried to say that one being a supervisor that integrity may be more important than the other. One has more integrity than the other. You depend on one to have more integrity than the other. Well, this is not the case with the standard of integrity. As far as integrity is concerned, a rookie LEO and a 30-year veteran LEO are looked upon as having the same amount of integrity at the same time at the same job and doing whatever they do. Is it a question of integrity or is it a question of the standard that the department is holding to the different officers because of the position they occupy? In other words, if you're a supervisory agent and you have supervisory obligations and duties, shouldn't that person be held to a higher standard when it comes to honesty and integrity? Well, I am not trying to evade the question. What you're saying is that the LEO, the rookie, is entitled to have less integrity than the 30-year veteran. And I don't think that's the case. I think that the standard of integrity comes up with even though you're a rookie and have less time, you're expected to have the standard of integrity of the 30-year veteran if you're going to look at the integrity issue. I think the issue before us is whether or not, for example, Mr. Montelongo, whether they were treated similar. And this is important because we have a... On that issue, you're talking that, rather you're arguing that they were treated differently, correct? That Mr. Ayala received a different penalty from other officers? Mr. Ayala received a different penalty, but he was charged differently than the other officers. Did you make that argument before the board? Yes, sir. I think, I believe we did. We did it on our rule 28 motion. I don't see in the record that this argument, the disparate penalty argument, was made before the board. And if you don't make it before the board, then we can't hear the argument here today. Well, the issue that we had, example, we have a case that came down after Mr. Ayala, Mr. Montelongo, and Mr. Medina had their cases, which is ARISPE versus DHS. That came down after all the hearings were held, and that came down in April of 2014, or 15 rather. I can't recall right now. But that's when it came down. And the other agents, the other LEOs, had already had their hearing. So for them, for their government to charge Mr. Ayala differently than Mr. ARISPE, there's an issue there that needs to be addressed by the court. Well, I think you did make the argument with respect to Mr. Medina, Mr. Montelongo, but I didn't see that you made that argument for Mr. Ayala. Oh, we thought we had, Your Honor, especially with Mr. Ayala, because in his case, he was denied his Cal Client privileges, or his rights. These were, that's been mandated by not only the agency, but the special agents are supposed to give an interviewee employee his Cal Client rights. It was completely ignored. And on the stand, the special agent could not articulate as to why he did not give Mr. Ayala his Cal Client rights. Sorry, go ahead. Okay, was there a letter or some kind of notification letter sent to Mr. Ayala about eight days before the interview? It was sent. That had the Cal Client warning? Yes, sir. It was no such document in the record. What they referred to was a general notice that says that if it's, that if the case or the interview is based on a criminal subject or a criminal crime, something criminal, that he has the right to remain silent. That would be more in line with Garrity. Okay, but this is not, this was not the case here. This was strictly an administrative matter. And in an administrative matter, he should have been noticed as to Cal Clients. Garrity speaks to criminal. Right, but Cal Clients is about the right for an employee to prosecute, right? I mean, that's the, that's the heart of why we have the Cal Clients warning. Your record indicates it. Your reliance on Cal Clients is more about, I don't, I don't see a good fit since you, your client willingly spoke with the investigators. My reliance on Cal Client is that the agency did not treat Mr. Ayala. All the rest of the, these are, this whole process that we're going through are 11 cases that came out because the individual LEOs went to a company called Biztax to have their tax prepared. All right, and so all other 10 were given their Cal Clients rights, not Mr. Ayala. That's a, that's a disparate treatment. When the provides certain documents and certain rights to the interviewee, there's no question they have to do it. My understanding is that Cal, Cal Client applies where, in order to protect an employee from being removed from a position as a result of the employee asserting the right to remain silent. But in this situation, Mr. Ayala did not remain silent. Mr. Ayala was not given his Cal Client rights, John. That's my point. It doesn't apply here because he spoke anyway. He didn't invoke his right to remain silent. No, Mr. Ayala was not told in administrative matters you can remain silent. They did give him the Garrity warning and say if you feel that you will be criminally prosecuted, you can invoke your Fifth Amendment rights. Wasn't he given that the Cal Client warnings in substance with the AWA form? No, sir. I don't, I don't believe that that's the case. The regulation or the procedure from the agency specifically says you will Cal Client. When Mr. Morrisey, the special agent, was put on the witness stand and he was asked why he would not, he did not provide Mr. Ayala with Cal Client rights as he did all the others, his response is I have, I don't know why. He did not articulate a legitimate reason as to denying Mr. Ayala that particular document. You may want to move on to Mr. Medina and Mr. Montelongo. Okay, thank you. Mr. Medina falls squarely within ARISPE. You have conduct unbecoming and he was considering the same tax issues. However, Mr. ARISPE, when we represented Mr. ARISPE and he went before the board, the board rescinded the removal and moved it to a 14-day suspension. It's the same set of facts. The only difference between these two individuals is that one is a supervisor, which is Mr. Medina, and one is not a supervisor, which is Mr. ARISPE. There's perhaps the other difference is that, and again this is the record shows that Mr. Medina, unlike the other officers, he was found to have acted willfully. I don't believe that's the case your honor. I think in this particular case, Mr. Medina and his wife was the one who's in charge of finances. That's been consistent all the way through. She's the one who's in charge of all his finances. She's the one who does the tax returns. She's the one who selects her. All he does is go to work and provide his check. In all reality, his wife is the more sophisticated individual between the two. She works for a college. She worked as a college administrator and she has her degree. Mr. Ayala has a high school education and whatever his wife says, he goes along with it. He loves her. There's no question about it. He loves her. So she provided an affidavit, which was presented at the pre-hearing stages and it was accepted as part of the record, where she says it was my responsibility. I'm the one that's in charge of these things. He basically went in, signed his tax return, which is what he's supposed to do according to the marriage, and he walks back out and takes care of his children. So there's no intent on Mr. Ayala's part. Now the way the special agents framed the question is, did you read the signature block? He said, no. Well, here's what it says. It says that you're signing this particular document on the penalty of perjury. Did you sign it? He said, yes. Then you committed perjury. He tried to say no. They said, yes, you did because you signed it. Now... You're well into your rebuttal time. Do you want to continue and save your rebuttal time? I mean, do you want to continue or do you want to save your rebuttal time? Oh, I'll save my rebuttal time, Your Honor. Okay. We'll restore you to four  years. Counselor Sweet, you're addressing, I take it, the Ayala case? Yes, Your Honor. May it please the Court, the Department of Homeland Security did not violate CalCANS. Under CalCANS, all it requires is that before an agency can remove an employee for refusing to answer questions, it must warn him that he has the right to remain, that he can be removed for refusing to answer questions and that any answers he gives in their fruits cannot be used against him. As Your Honors have noted, that does not apply here because Mr. Ayala was not removed for refusing to answer questions. Here's what I guess I'm trying to figure out. It seems to me that the combination of the two notices you gave, gave him the two notices that CalCANS requires. And so, to me, I think the CalCANS issue goes away. It said, we can't fire you for claiming your Fifth Amendment privilege. That was the first notice. And the second one said, anything you say here can't be used against you in the criminal case. That was the second notice. Now, suppose for a minute that those were not given to him. And he's just thinking, I better cooperate. So he's got a choice. Either he's silent or he speaks. And he speaks. Now, isn't that a problem? Because it's not strictly within CalCANS, because CalCANS is about firing for the refusal. But this is the other option he had. He spoke instead of being silent. But that was a coerced speaking, because he knew this was a subject on which he could be criminally prosecuted, perhaps. Your Honor, before I answer, I just want to clarify in your predicate. Actually, both those warnings were provided on the same administrative acknowledgement warning form. They weren't separate forms. The one that was given eight days earlier warned him of his right to remain silent. But that's Supplemental A1 and 2 are on the same day? Supplemental 2 was given him on the same day as his confession. And that contains both the CalCANS warnings. Supplemental 1 was given to him eight days earlier. And that warned him that he had the right to remain silent, which CalCANS does not require. I just wanted to clarify that. OK. I don't like that. But getting to the answer to your question. In the absence of those warnings, could it really be the case that the underlying Fifth Amendment problem of coercion doesn't apply because feeling the coercion, he chose option A rather than B? Your Honor, it's important to remember we're dealing here with prophylactic rules to protect the right against self-incrimination. They're only implicated when you're trying to exclude any compelled statement against him in a criminal proceeding. Then there is no Fifth Amendment self-incrimination issue. He is not being compelled to provide testimony against himself in a criminal case. But was Mr. Ayala aware or was there a reason for him to believe that this was a criminal proceeding or just a civil proceeding? There was nothing that would suggest this was criminal. The IRS had already determined that they were not going to pursue a criminal proceeding, right? Correct, Your Honor. And in any event, this warns him that they couldn't use any statements here against him in a criminal proceeding. Essentially, that provided youth immunity to him and any issue about self-incrimination at that point evaporated because he'd been warned or this gave him immunity from using his confession against him in a criminal proceeding. Turning to the disparate penalty argument, Mr. Ayala waived that, as Your Honor noted. It wasn't raised below. While the ERISPE decision was issued in April, that was before the final decision by the board in this case. So he could have raised it below. That decision was on September 5, 2014, which was after the April ERISPE decision. You say he could have, I guess, briefing and closed and the oral, hearing it already happened? He could have, yes, but he could have raised it as a motion based on new evidence. But it's important to note that that was a decision by the board. The agency originally had removed Mr. ERISPE. So they treated him the same as they treated Mr. Ayala. They especially distinguishing Mr. Ayala's case on the grounds that Mr. Ayala, because there was evidence that he had paid his tax payer to file false returns, had followed his returns intentionally. Therefore, the two were not similarly situated even if he reached the  Okay. Thank you, Your Honor. Thank you. Ms. Schorfield? And you're addressing Montelongo? Yes, Your Honor. Mr. Montelongo has raised four challenges to the board's decision upholding his removal. Since we have limited time here today, I'm going to jump to the fourth issue, the disparate Certainly, I'm happy to address anything else the court is concerned about. Can I ask one question? I probably should know this, but on the question of intent to file the false tax returns, did the board, either the full board or the administrative judge, apply a disparate sentence? I don't think so. Well, I think the administrative judge made, there is one sentence in her decision about recklessness, but I think there's an earlier sentence where she's basically finding intent. Let me see if I can put my fingers on that. So I guess I'm looking at the, I don't know, page five of the February 14th decision. Is that what you're looking at? Yes, Your Honor. Okay, so what are the two passages? So page 13 of that decision, she states, I find that- Roughly where are you? I'm sorry, I'm towards the very bottom of the page, not the very bottom, maybe one sentence in a parenthetical above. This is page 13 in her numbering or- Page 13 in the administrative judge's numbering. Thank you. Okay, got it. She states, I find that the appellant's testimony regarding his assertion that he did not intentionally file a false tax return or provide false information on his 2007 tax return with the intention of defrauding, deceiving, or misleading is not credible. So I think that's a finding, that he filed his tax return with the intention of defrauding, deceiving, and misleading. It cites Hillan. Do you know what that page of Hillan says is the standard? Not off the top of my head, no, not beyond what's in the parenthetical. You said there was a reference to recklessness. Where is that? I believe that's on the next page, page 14. She states, as a result, I find, and this is right before the subheading, as a result, I find that the appellant filed a false tax return and intended to defraud the government through his reckless disregard for the truth. Preponderant evidence supports the agency's charge that appellant filed a false tax return. Are those really the same standard, intent, and reckless disregard? Well, I think, I mean, I think her earlier statement- might make that unimportant, and I'm not sure that this has been squarely presented to us, but- So intent and reckless disregard, I mean, I think, I think reckless disregard for the truth could meet the standard for falsification. I think that is actually, just to see if I have- Is this a situation here where Mr. Montelongo paid his tax 200 or 250 dollars, additional dollars in cash, so that the tax preparer would include the donation on his taxes? Is it the case that he did that? Yes, your honor. So, when the administrative law judge says that he does not find Mr. Montelongo's testimony to be credible because of the fact that he admits that he paid the 200 dollars for a deduction, isn't that what we're talking about? That it- And isn't that the, isn't that the intent to file a false tax return? Yes, your honor. I believe that earlier statement in the decision does find intent. I see that I'm out of time. Do you have any questions? No. Okay, thank you very much. Thank you, your honor. Mr. Rodriguez,  That's correct, your honor. May it please the court, of the three cases currently before the court, Mr. Medina's conduct was by far the most serious. In four separate tax years, he falsely claimed over 70,000 dollars in charitable contributions that he did not make. On appeal before this court, Mr. Medina raises four arguments. His first argument, and I'll jump right to it, is the disparate penalty argument, where he points to the case of Jose Yarispe, and says that these two men, Mr. Medina and Mr. Yarispe, were similarly situated and therefore Mr. Medina should also have received a 14-day suspension rather than removal. The fact of the matter is that that's untrue for two different reasons. One, Mr. Medina was a supervisor. He was held to a higher level of trust. He was in charge of six employees below him. Mr. Yarispe was not a supervisor. Two, their conduct was extremely different. For one, Mr. Yarispe never admitted to fraud and was found by the administrative judge to only have reasonably relied upon the advice of Iztax, the tax preparation company that both men used. Mr. Medina, on the other hand, did admit to fraud on multiple occasions, and again, his conduct was much more serious in that the amounts claimed were $72,109. I guess Mr. Medina is arguing that he is like Mr. Yarispe in the sense that both of them were quite cavalier about the tax returns. They didn't really know anything about the contents of the tax returns, and so they weren't paying attention, and given that the AJ and the Yarispe case credited Mr. Yarispe with that, knocked down the penalty to a suspension, whereas here, for Mr. Medina, who likewise didn't really know what was going on with the tax returns, and was just relying on his wife, is being knocked out of his job. Well, Your Honor, I think that there are other differences. For one, Mr. Medina knew that his wife had told him that they were playing with the numbers so that they could achieve a higher tax return. Beyond that, Mr. Medina admitted, and the administrative judge noted this in the initial decision, that before signing his 2012 tax returns, wherein he claimed over $10,000 that year in charitable contributions, he asked his wife, did we actually make this charitable contribution, because he questioned whether or not they could. He admitted in his affidavit that they could not afford those charitable contribution amounts. I'm sorry, you were, I think, about to say he asked his wife, did we actually, and then you changed course, because I'm not sure the record says that he asked her, and she said no, as opposed to we could never afford $10,000 in appendix in the initial decision. I mean, is there that question and answer? Well, Your Honor, it's not in the record for the court, but because there was a difference of opinion with regard to the transcripts from the hearings, the court, the administrative judge, actually listened to the investigative hearing testimony, and so beyond the affidavit, we also have the statements that Mr. Medina made, and in those statements, and I would hate to paraphrase to be wrong, so I want to find the initial decision, and I will in a second, but my understanding of it was that he did question his wife, and despite his misgivings about whether or not they could actually make that dollar amount of charitable contribution, he nonetheless signed it. Moreover, Mr. Medina admitted that he reviewed or glanced at or looked over all four of the tax returns in question before signing them under penalty of perjury. And beyond that, there's also the fact that in 2009, or rather for tax year 2009, when he noticed that some of his colleagues were being audited, Mr. Medina and his wife then switched from BizTax to H&R Block. That particular tax year, the charitable contributions went from $30,000 the year before to $1,900 the year after. Now the following two years, when it appeared that Mr. Medina was not going to be audited, again the charitable contribution amounts jumped to over $10,000 per year. So the conduct, getting back to disparate penalty, was much more serious in that there was both direct and circumstantial evidence that Mr. Medina intentionally defrauded the government on his taxes. For that reason, we believe this argument is meritless. Now I'm running out of time, so I'll quickly get to the other remaining three arguments. The next one is about intent. Mr. Medina supplies 14 pages of his that the agency failed to prove intent. That's simply not true. He fails to address the fact that there's direct evidence of intent in the form of two different affidavits wherein, in multiple occasions, Mr. Medina squarely admits to committing fraud. Next, Mr. Medina paints himself as the victim of his wife's actions, but as I've just mentioned, there's substantial evidence that indicates that he knew exactly what his wife was doing. He reviewed the taxes before filing them, and he signed them under perjury. My final argument relates to whether or not certain quote, weight, according to Mr. Medina, should be given to the fact that the IRS did not take exception to the taxes in question. And for that, we simply say that we have no idea whether or not the IRS ever conducted an investigation. Whether or not they did is irrelevant for this particular purpose because DHS did conduct its own investigation. With that, I'm out of time. Thank you very much. Mr. Tejadino, we've restored your rebuttal time to four minutes. Let's go to Mr. Medina. Mr. Medina's affidavits that you have before you, the two that are at issue, are the ones that the special agents are the ones who produce these from the so-called recordings. I think we've already gone into that in our arguments, in our briefs, that we have like an hour and 50 minutes or an hour and a half of tapes of recordings when he was in there for over eight hours. So we feel that not only he didn't receive the full scope of what was actually said at these so-called interviews or interrogations, but the fact is the agency did not produce them. Was there evidence, a declaration, this is Mr. Medina, right, from Mr. Medina or other evidence, asserting that the entirety was taped? Well, when that was done at the pre-hearing, I mean at the pre-hearing stages, your honor. Do we know from the record whether a tape was originally made of the entirety of the interview? I only was able to go by what the other attorneys have just cited. We have what's before us. Even though I requested it in writing that they produce the entire record, all we got was like an hour and a half. Let me just see. Is there evidence, I know what was produced, I know that there's is, is there evidence that the entirety was taped? Or are we talking about a real possibility that they gave you all that tape they ever had? When I asked, your honor, when we had Mr. Morsi under in deposition, we asked him, where is the entire, you had him for over eight hours. If you combine all the interviews that he went to and all that was produced was about an hour and a half, two hours. We asked him about the disparity and he didn't address, he just couldn't articulate an answer. It came out to the same thing that when he was asked as to why he didn't provide Mr. Ayala with the calcines. He didn't know why. The calcines issue, your honor, now going to Mr. Ayala is such that the agency didn't follow its own promulgated rules. And that in itself is a violation. I mean, they violated their own procedures, their own regulations, period. And that, that should be enough to withstand the attack by the agency. Mr. Montelongo, both Mr. Montelongo and Mr. Ayala were charged with a so-called civil, and I put in quotation marks, type charge. DHS does not have that authority. They didn't charge him with conduct unbecoming. They charged him with filing a false tax return after the Internal Revenue Service had cleared them of such conduct. So now they come back and they say, oh, we're going to charge you with filing a false tax return. They don't have that authority. They don't have the education. They don't have the experience. They don't have the knowledge to be able to do, make that kind of I would understand it. But here, DHS went beyond its authority. Charging him with conduct unbecoming, okay, but not with filing a false tax return. They don't have that knowledge. I don't think Congress has given it to them. And Mr. Montelongo, again, I asked the court to consider, do we give? Because he is a supervisor and I understand he has more responsibility as far as his job is concerned. And yes, the integrity should rise to the level of the 30-year veteran. As far as you're going to look at integrity, there should be no difference between the 30-year veteran or the supervisor or the rookie on the beat. Now, as far as the, I'm out of time. Okay, all right. We thank you very much. We thank all counsel for their arguments and we'll take the case under consideration.